**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOEL FRIEDMAN, derivatively on behalf of B. RILEY FINANCIAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BRYANT R. RILEY, THOMAS J. KELLEHER, PHILLIP J. AHN, ROBERT L. ANTIN, TAMMY BRANDT, ROBERT D'AGOSTINO, RENEE E. LABRAN, RANDALL E. PAULSON, MICHAEL J. SHELDON, and MIMI K. WALTERS,<br><br>Defendants,<br><br>and<br><br>B. RILEY FINANCIAL, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Joel Friedman ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint, for the benefit of Nominal Defendant B. Riley Financial, Inc. ("B. Riley" or the "Company"), against Bryant R. Riley ("Riley"), Thomas J.

Kelleher ("Kelleher"), Phillip J. Ahn ("Ahn"), Robert L. Antin ("Antin"), Tammy Brandt ("Brandt"), Robert D'Agostino ("D'Agostino"), Renee E. LaBran ("LaBran"), Randall E. Paulson ("Paulson"), Michael J. Sheldon ("Sheldon"), and Mimi K. Walters ("Walters") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, based on the investigation of Plaintiff's counsel, including a review of publicly available information, filings by B. Riley with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain officers and members of B. Riley's Board of Directors (the "Board") from January 28, 2021 through the present (the "Relevant Period").

2. B. Riley is a financial services platform that provides investment banking, brokerage, wealth management, asset management, direct lending, business advisory, valuation, and asset disposition services to a broad client base spanning public and private companies, financial sponsors, investors, financial institutions, legal and professional services firms, and individuals. The Company also invests in and acquires companies or assets, owning and operating consumer businesses and investing in brands on a principal basis.

3. For the past two decades, B. Riley and its Co-Chief Executive Officer ("CEO"), Defendant Riley, have worked closely with Brian Kahn ("Kahn"), the former CEO of Franchise Group, Inc. f/k/a Liberty Tax ("Franchise Group" or "FRG"), providing funding and support to Franchise Group, its subsidiaries, and other entities controlled by Kahn.

4. In May 2023, the Company entered into an agreement to assist Kahn in leading a management buyout of Franchise Group, which was completed in August 2023 (the "FRG Buyout"). Specifically, B. Riley secured financing for the $2.8 billion deal from Nomura Holdings, Inc. ("Nomura"), allowing Kahn and other senior management of Franchise Group to acquire the 64% stake in the company that they did not already own.

5. Then, on November 2, 2023, Kahn was implicated in a conspiracy to defraud investors of $294 million when John Hughes ("Hughes"), the President and Chief Compliance Officer of Prophecy Asset Management LP ("Prophecy") was charged by the SEC with violations of the antifraud provisions of the federal securities laws. The U.S. Department of Justice ("DOJ") announced criminal charges against Hughes the same day.

6. On November 3, 2023, after the close of trading, the *Friendly Bear* posted on social media platform X (formerly known as Twitter) questioning whether B. Riley knew of Kahn's involvement in the Prophecy fraud and whether the Company disclosed the associated risk to Nomura when securing financing for the FRG Buyout. The *Friendly Bear* also opined that the DOJ's "charging document clearly implicates [Kahn] in Hughes' crime. There is a high chance of indictment here."

7. On this news, B. Riley's stock price fell $9.02, or 22%, to close at $32.54 per share on the next trading day, November 6, 2023.

8. On November 9, 2023, the *Friendly Bear* reported that "B. Riley ended up funding 281MM of what was around a 560MM equity check. That's over 50% ownership. Yet they claim to have only 31% voting rights. It looks like B Riley engaged in some funny business to avoid consolidation and placed control of Franchise Group in the hands of the star of 'Prophecy' – Brian Kahn."

9. On this news, the Company's stock price fell $4.47, or 15%, to close at $25.60 per share on November 10, 2023. B. Riley's stock price continued to fall $3.59, or 14%, over the next consecutive trading session to close at $22.01 per share on November 13, 2023.

10. On January 21, 2024, *Bloomberg* reported that the SEC had "carried out interviews in recent months about B. Riley and its relationship with Brian Kahn[.]" On this news, the Company's stock price fell by $0.50, or 2.5%, to close at $19.68 per share on January 22, 2024.

11. On February 12, 2024, the *Wall Street Journal* published two articles revealing a "longer and closer relationship [between B. Riley and Kahn] than previously known." Citing a July 2023 slide presentation by Nomura, the *Wall Street Journal* identified a series of undisclosed loans by B. Riley to Kahn over the years, the earliest of which was a $37 million loan in July 2019. According to the *Wall Street Journal*, which reviewed Uniform Commercial Code financing statements filed with state agencies in Nevada, Delaware, and Florida, B. Riley made ten different loans to Kahn and entities he controlled from 2018 through 2023. By mid-2023, the principal balance of these loans had ballooned to $154 million. In addition, the *Wall Street Journal* articles revealed that B. Riley "lent $201 million to Kahn's investment firm, which pledged its FRG shares as collateral."

12. Following the publication of these articles, the Company's stock price decreased from a closing price of $20.84 per share on February 12, 2024, to a closing price of $18.73 per share on February 13, 2024, a decline of more than 10%. By the close of trading on February 21, 2024, B. Riley's stock price had declined to only $15.20 per share. As of January 14, 2025, the Company's stock was trading around $4 per share.

13. As a result of the foregoing, a securities class action lawsuit is currently pending in this Court against B. Riley and Defendant Riley, captioned *In re B. Riley Financial, Inc. Securities Litigation* Case No. 2:24-cv-00662-SPG-AJR (the "Securities Class Action").

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is headquartered in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have received substantial compensation in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

18. Plaintiff is a current shareholder of B. Riley and has continuously held B. Riley stock at all relevant times.

19. Nominal Defendant B. Riley is a Delaware corporation. Its executive headquarters are located at 11100 Santa Monica Boulevard, Suite 800, Los Angeles, CA 90025. The Company's common stock and 6% Senior Notes trade on the Nasdaq exchange ("Nasdaq") under the ticker symbols "RILY" and "RILYT" respectively.

20. Defendant Riley has served as the Company's Chairman and Co-CEO since June 2014 and June 2018, respectively, and as a director since 2009. According to the proxy statement filed on Schedule 14A with the SEC on October 22, 2025 (the "2025 Proxy Statement"), in 2024, Defendant Riley received $2,168,622 in total compensation from the Company.

21. Defendant Kelleher has served as the Company's Co-CEO since July 2018 and as a director since October 2015. According to the 2025 Proxy Statement, in 2024, Defendant Kelleher received $2,168,622 in total compensation from the Company.

22. Defendant Ahn has served as the Company's CFO and Chief Operating Officer since April 2013. According to the 2025 Proxy Statement, in 2024, Defendant Ahn received $1,194,211 in total compensation from the Company.

23. Defendant Antin has served as a Company director since June 2017. According to the 2025 Proxy Statement, in 2024, Defendant Antin received $84,993 in total compensation from the Company.

24. Defendant Brandt has served as a Company director since December 2021. According to the 2025 Proxy Statement, in 2024, Defendant Brandt received $140,316 in total compensation from the Company.

25. Defendant D'Agostino has served as a Company director since October 2015. Defendant D'Agostino also serves as a member of the Board's Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant D'Agostino received $94,993 in total compensation from the Company.

26. Defendant LaBran has served as a Company director since August 2021. Defendant LaBran also serves as a member of the Board's Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant LaBran received $147,816 in total compensation from the Company.

27. Defendant Paulson has served as a Company director since June 2020. Defendant Paulson also serves as the Chair of the Board's Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant Paulson received $94,993 in total compensation from the Company.

28. Defendant Sheldon served as a Company director from July 2017 until December 2025. According to the 2025 Proxy Statement, in 2024, Defendant Sheldon received $82,493 in total compensation from the Company.

29. Defendant Walters has served as a Company director since July 2019. According to the 2025 Proxy Statement, in 2024, Defendant Walters received $145,316 in total compensation from the Company.

**<u>Relevant Non-Parties</u>**

30. Franchise Group was a Delaware corporation that owned and operated franchised and "franchiseable" businesses. Before the FRG Buyout, Franchise Group's stock traded on the Nasdaq under ticker symbol "FRG."

31. Kahn was Franchise Group's CEO from October 2019 until his resignation in January 2024.

32. Prophecy was a registered investment advisor, led by Hughes that advised multiple hedge funds and reported more than $500 million in assets under management. By 2020, the losses in funds managed by Prophecy exceeded $350 million, leading to the indefinite suspension of redemptions by investors.

33. Hughes was the Co-Founder, President, Chief Operating Officer, and Chief Compliance Officer of Prophecy. On November 2, 2023, Hughes pleaded guilty in federal court to information charging him with one count of conspiracy to commit securities fraud.

34. Vintage Capital Management, LLC ("Vintage") is a private equity firm founded by Kahn.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

35. By reason of their positions as officers, directors, and/or fiduciaries of B. Riley and because of their ability to control the business and corporate affairs of B. Riley, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

36. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

37. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

38. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

39. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## <u>**CODE OF BUSINESS CONDUCT AND ETHICS**</u>

40. B. Riley maintains a Code of Business Conduct and Ethics (the "Code of Conduct") that "summarizes basic guiding principles and standards of conduct to guide all employees, directors and officers of the Company." The Code states that "[e]very director, officer and employee has a duty to adhere to this Code."

41. In a section titled "Honest and Candid Conduct," the Code of Conduct states the following:

> Each director, officer and employee owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest and candid. Deceit and subordination of principle are inconsistent with integrity.
>
> Each director, officer and employee must:
>
> - Act with integrity, including being honest and candid while still maintaining the confidentiality of information where required or consistent with the Company's policies.
> - Observe both the form and spirit of laws and governmental rules and regulations, accounting standards and Company policies.
> - Adhere to a high standard of business ethics.

42. In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following:

> Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which we operate and the rules and regulations applicable to the Company's business. Although not all employees are expected to know the details of all of these laws, rules and regulations, it is important to know enough to determine when to seek advice from supervisors, managers or other appropriate personnel who should consult with the General Counsel or another member of the Legal Department as necessary or appropriate. Compliance with the law does not obviate the need to act with the highest honest and ethical standards.
>
> To promote compliance with laws, rules, regulations and the policies of the Company, including insider trading rules, other securities laws, and anti-discrimination and antiharassment laws and policies, the Company has established various compliance policies and procedures and, where appropriate, may conduct information and training sessions.

43. In a section titled "Insider Trading," the Code of Conduct states the following:

> Employees, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business. All non-public information about the Company should be considered confidential information. To use non-public information about the Company or any other company for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. Please refer to the Company's Insider Trading Policy for additional information. The purpose of such policy is both to inform you of your legal responsibilities and to make clear to you that the misuse of sensitive information is contrary to Company policies and to set forth procedures with respect to trading in the Company's securities.

44. In a section titled "Public Disclosure," the Code of Conduct states the following:

> The Company is committed to providing full, fair, accurate, timely and understandable disclosure in the periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company. In meeting such standards for disclosure, the Company's executive officers and directors shall at all times comply with the Company's disclosure obligations

> pursuant to applicable securities laws and SEC rules and, as necessary, appropriately consider and balance the need or desirability for confidentiality with respect to nonpublic negotiations or other business developments. The Company's CEO and CFO are responsible for establishing effective disclosure controls and procedures and internal controls over financial reporting within the meaning of applicable SEC rules and regulations. The Company expects the CEO and CFO to take leadership roles in implementing such controls and procedures and to position the Company to comply with its disclosure obligations and otherwise meet the foregoing standards for public disclosure. Inadvertent public disclosure of the Company's material non-public information should be reported immediately to the CEO and CFO. Each -5- director, officer or employee who is involved in the Company's disclosure process must:
>
> (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting;
>
> (b) not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations;
>
> (c) properly review and critically analyze proposed disclosure for accuracy and completeness (or, where appropriate, delegate this task to others); and
>
> (d) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.
>
> No employee, officer or director should interfere with, hinder or obstruct the Company's efforts to meet the standards for public disclosure set forth above.

45. In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states the following:

> All employees, directors and officers should endeavor to protect the Company's property, electronic communications systems, information resources, facilities and equipment and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation pursuant to Section 16 of this Code. Company assets should not be used for non-Company business, although we recognize that incidental personal use may be permitted without adversely affecting the interests of the Company. Personal use of Company assets

> must always be in accordance with Company policy. You should consult your supervisor for appropriate guidance and permission.
>
> The obligation of employees, directors and officers to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, designs, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of this information would violate Company policy. It could also be illegal and result in civil or even criminal penalties.
>
> Unauthorized duplication of copyrighted computer software violates the law. You must neither engage in nor tolerate the making or using of unauthorized software copies and must comply will all license and purchase terms regulating the use of any software. The Company will provide all software needed to meet legitimate needs.

## AUDIT COMMITTEE CHARTER

46. B. Riley also maintains an Audit Committee Charter (the "Charter") that states that the purpose of the Audit Committee is to:

- Assist the Board in its oversight of:
  - the integrity of the Company's financial statements;
  - the qualifications, independence and performance of the registered public accounting firm employed by the Company for the audit of the Company's financial statements (the "independent auditors");
  - the performance of the Company's internal audit function; and
  - the Company's compliance with certain other legal and regulatory requirements.
- Prepare the report of the Committee required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual report on Form 10-K or the proxy statement for the Company's annual meeting.

47. In a section titled "Duties and Responsibilities," the Charter states the following, in relevant part:

Financial Statements

- The Committee shall discuss with management and the independent auditors the annual audited financial statements to be included in the Annual Report on Form 10-K (or the Annual Report to Shareholders if distributed prior to the filing of Form 10-K) and the quarterly financial statements to be included in the Quarterly Reports on Form 10-Q, including the matters required to be communicated by the auditors pursuant to applicable audit standards, as well as the disclosures contained under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the Company's filing of the Form 10-K and Form 10-Q reports. The Committee shall determine whether to recommend inclusion of the audited financial statements in any Annual Report on Form 10-K.

- To the extent it deems necessary or appropriate, the Committee shall review and discuss with management earnings press releases, as well as Company policies with respect to earnings press releases, financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (relating to the type of information to be disclosed and the type of presentation to be made) rather than specific as to individual press releases or information provided to analysts or rating agencies.

- The Committee shall discuss with management and the independent auditors, as appropriate, major changes and other major questions of choice respecting the appropriate accounting principles, estimates, judgments and practices to be applied in the preparation of the Company's financial statements.

- The Committee shall discuss with management material pending legal proceedings involving the Company and consider other contingent liabilities, as well as other risks and exposures, that may have a material impact on the financial statements.

- The Committee shall review the Company's policies with respect to risk assessment and risk management.

- The Committee shall review with management and the independent auditors the financial statement effects of pending regulatory and accounting initiatives.

- The Committee shall review the impact of off-balance sheet arrangements on the Company's financial statements.

- The Committee shall review any significant disputes between management and the independent auditors that arise in connection with the preparation of the Company's financial statements. The Committee shall review and discuss with management and the independent auditors any information regarding "second" opinions sought by management from any other accounting firm with respect to the accounting treatment of a particular event or transaction.

<u>Internal Controls</u>

- The Committee shall review and discuss with management and the independent auditors the Company's policies and procedures to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with GAAP and applicable rules and regulations of the SEC and Nasdaq.

- The Committee shall consider the quality and adequacy of the Company's internal control over financial reporting and, to the extent applicable, review the independent auditors' attestation with respect thereto.

- The Committee shall review the adequacy of the Company's internal audit function and shall approve the engagement of any outsourced service provider.

- The Committee shall review with the CEO and CFO the content of the certifications to be included in Form 10-K and Form 10-Q reports and certification process and related disclosures regarding disclosure controls and procedures and internal control over financial reporting.

- The Committee shall inquire of the Company's CEO and CFO as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- The Committee shall obtain reports from management, the internal audit staff and service providers and the independent auditors concerning the Company's compliance with applicable laws and regulations and compliance by directors, officers and employees with the Company's Code of Business Conduct and Ethics, and the Committee shall advise the Board with respect to policies and procedures regarding such compliance matters.

## CORPORATE GOVERNANCE GUIDELINES

48. B. Riley maintains Corporate Governance Guidelines (the "Guidelines") that state that they are designed to "advance the functioning of the Board and its committees and set forth the Board's expectations as to how it should perform its functions."

49. In a section titled "Role of the Board," the Guidelines state the following, in relevant part:

> The Company's business shall be conducted by its officers, managers and employees, under the direction of the Chief Executive Officer and the oversight of the Board. The directors are elected by the stockholders to oversee management and to exercise their business judgment in the best interests of the Company. In addition to its general oversight of management, the Board or its committees perform the following principal functions:
>
> - Review, evaluate, and, where appropriate, approve the Company's business strategies and long-term plans, and evaluate its performance against such plans;
> - Review, evaluate and approve major corporate actions;
> - Oversee management's efforts to establish and maintain for the Company the highest standards of legal and ethical conduct, including with respect to the integrity of the Company's accounting, financial reporting and finance processes and systems of internal control, compliance with law and ethics, and the integrity of relationships with customers, suppliers and other stakeholders; and
> - Select, evaluate and compensate the Company's executive officers and review management succession planning.
>
> In order to facilitate the effective performance of such Board functions, the following minimum expectations apply to directors:
>
> - All directors are expected to attend Board meetings and meetings of committees on which they serve, prepare for meetings, review relevant materials, ask questions and engage in discussion, and spend the time needed and meet as frequently as necessary to properly discharge their responsibilities. Participation by telephone is appropriate in the event of scheduling conflicts.

- Directors should be familiar with the Company's business, its financial statements and capital structure, and the risks and competition it faces, to facilitate active and effective participation in the Board and committee meetings he or she attends. Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask incisive, probing questions and require accurate, honest answers; they are expected to act with integrity; and they are expected to demonstrate a commitment to the Company, its values, its business plan, long-term stockholder value and the Company's dividend policy.

## SUBSTANTIVE ALLEGATIONS

50. In 2014, B. Riley went public at $5 per share through a merger with Great American Group, a company that provides valuation appraisal and liquidation services to companies that are considering restructuring. Initially listed on the OTC Bulletin Board, B. Riley was approved to be uplisted to Nasdaq in July 2015.

51. In 2017, the Company expanded significantly when it acquired FBR Capital Markets.

52. On June 18, 2018, Vintage announced that it would acquire Rent-A-Center, Inc. ("Rent-A-Center") for $15 per share in cash, representing total consideration of approximately $1.365 billion (including net debt). B. Riley served as an equity and debt participant in the transaction, in what Defendant Riley later described as the largest deal his firm had ever arranged.

53. In a press release announcing the deal, Defendant Riley noted that the Company had "worked with the Vintage Capital team for over two decades" and Kahn added that Vintage had "worked with the B. Riley team on multiple deals[.]"[3] In fact, Kahn was working with B. Riley on multiple deals that year alone.

54. In July 2018, B. Riley and Vintage invested in Franchise Group's predecessor, Liberty Tax, Inc. ("Liberty"), obtaining 22.1% and 14.8% of Liberty's voting power, respectively, as well as five seats on the nine-member board. Kahn was appointed to Liberty's board, and Defendant Riley served alongside him until his resignation on March 31, 2020.

55. In August 2018, Babcock & Wilcox Enterprises, Inc. announced that it had amended its first-lien revolving credit facility and received a commitment for a Last Out Loan

that would provide net proceeds of $30 million from Vintage. B. Riley backstopped the agreement.

56. As Kahn and B. Riley continued to work together, "an absolute disaster" struck in connection with the Rent-A-Center deal in December 2018. As a Delaware judge later wrote after the matter made its way to court, someone on the buyout team at Vintage "simply forgot" to send Rent-A-Center an extension notice by the required deadline.

57. Rent-A-Center then terminated the deal and demanded a $126.5 million termination fee. Litigation ensued and, in April 2019, Vintage ultimately settled the case, agreeing to pay $92.5 million in cash and losing out on the chance to acquire Rent-A-Center. The stock price for Rent-A-Center, now known as Upbound Group Inc., has doubled since the failed deal.

58. Despite these difficulties, Kahn continued to build his business and solidify his relationship with Defendant Riley, who was on Franchise Group's board during several of its acquisitions.

59. In February 2020, B. Riley served as an advisor to Franchise Group in its acquisition of American Freight. The Company also arranged and placed a $675 million credit facility in connection with the deal. In a press release announcing the transaction, defendant Riley stated that he was "pleased to work with Brian Kahn and his team on [the] transaction" and that he looked "forward to continuing to serve as a strategic partner to Franchise Group."

60. In November 2021, Franchise Group purchased furniture chain W.S. Badcock ("Badcock"), with B. Riley buying two batches of Badcock's customer receivables.

**False and Misleading Statements**

61. On January 10, 2023, the *Wall Street Journal* published an article that Franchise Group was considering a management-led buyout spearheaded by Kahn. According to the article, Kahn would take Franchise Group private for somewhere between $30 to $35 per share.

62. On February 28, 2022, the Company filed its Form 10-K with the SEC, reporting its financial and operating results for the quarter and year ended December 31, 2022 ("2021 10-K"). The Individual Defendants each signed the 2021 10-K. The 2021 10-K filing stated, in

relevant part:

> Badcock Loan Receivable
>
> On December 20, 2021, the Company entered into a Master Receivables Purchase Agreement ("Receivables Purchase Agreement" [sic] with W.S. Badcock Corporation, a Florida corporation ("WSBC"), ***an indirect wholly owned subsidiary of [FRG]. The Company paid $400,000 in cash to WSBC for the purchase of certain consumer credit receivables of WSBC.*** The Company recognized the $400,000 as part of its loans receivable, at fair value on the consolidated balance sheets, which is collateralized by the performance of the consumer credit receivables of WSBC. In connection with the Receivables Purchase Agreement, the Company entered into a Servicing Agreement (the "Servicing Agreement") with WSBC pursuant to which WSBC will provide to the Company certain customary servicing and account management services in respect of the receivables purchased by the Company under the Receivables Purchase Agreement. In addition, subject to certain terms and conditions, ***FRG has agreed to guarantee the performance by WSBC of its obligations under the Receivables Purchase Agreement and the Servicing Agreement.***

63. On March 16, 2023, the Company filed its Form 10-K with the SEC, reporting its financial and operating results for the quarter and year ended December 31, 2022 ("2022 10-K"). Each of the Individual Defendants signed the 2022 10-K. The 2022 10-K filing stated, in relevant part:

> On December 20, 20221, the Company entered into a Master Receivables Purchase Agreement with W.S. Badcock Corporation, a Florida Corporation ("WSBC"), ***an indirect wholly owned subsidiary of [FRG]. The Company paid $400,00 in cash to WSBC for the purchase of certain consumer credit receivables of WSBC.*** *The* accounting for this transaction resulted in the Company recording a $400,000 loan receivable from WSBC with the recognition of interest income at an imputed rate based on the cash flows expected to be received from the collection of the consumer receivables that serve as collateral for the loan. The loan receivable was measured at fair value on the consolidated balance sheets.
>
> ***On September 23, 2022, the Company's subsidiary, B Riley Receivables II, LLC, as Delaware limited liability company, entered into a Master Receivables Purchase Agreement ("2022 Badcock Receivable") with WSBC. This purchase of $168,363 consumer credit receivables of WSBC was partially financed by a $148,200 term loan*** discussed in Note 13. The accounting for this transaction resulted in the Company recording a $168,363 loan receivable from WSBC with the recognition of interest income at an imputed rate based on the cash flows

> expected to be received from the collection of the consumer receivables that serve as collateral for the loan. The loan receivable was measured at fair value on the consolidated balance sheets.
>
> In connection with these loans, the Company entered into a Servicing Agreement with WSBC pursuant to which WSBC will provide to the Company certain customary servicing and account management services in respect of the receivables purchased by the Company under the Receivables Purchase Agreement. In addition, subject to certain terms and conditions, ***FRG has agreed to guarantee the performance by WSBC of its obligations under the Master Receivables Purchase Agreements and the Servicing Agreement.***
>
> As of December 31, 2022 and 2021, loans receivable to WSBC in the Company's consolidated balance sheet included loans measured at fair value in the amount of $318,109 and $400,000 respectively.

64. On March 16 and 17, 2023, Kahn and Defendant Riley met in person to discuss B. Riley's interest in an acquisition of Franchise Group, and Defendant Riley indicated that "B. Riley intended to submit a non-binding offer to acquire the Company."

65. In April 2023, Defendant Riley presented to the Board regarding a proposed acquisition of Franchise Group.

66. According to a Proxy Statement filed with the SEC by Franchise Group, "[b]etween April 30 and May 9, 2023, B. Riley continued to evaluate the nature and structure of the proposed acquisition of" Franchise Group and held discussions with "Kahn regarding the potential transaction and the relationship among the parties with respect thereto."

67. On May 10, 2023, the merger agreement was executed and B. Riley issued a press release announcing the transaction stating, in relevant part:

> [Franchise Group] today announced that it has entered into a definitive agreement and plan of merger (the "Merger Agreement") ***pursuant to which members of the senior management team of [Franchise Group] led by Brian Kahn, the Company's [CEO], (collectively with affiliates and related parties of the senior management team,*** *the "Management Group"),* ***in financial partnership with a consortium that includes B. Riley . . . and Irradiant Partners,*** will acquire the approximately 64% of the Company's issued and outstanding common stock that the Management Group does not presently own or control. The transaction has an

> enterprise value of approximately $2.6 billion, including the Company's net debt and outstanding preferred stock.
>
> * * *
>
> Brian Kahn, CEO of [Franchise Group] stated, "We are excited to have this opportunity to continue our business strategy of partnering with high quality franchisees, operators and financial institutions, while also delivering certain value to our public stockholders despite a challenging business environment."

68. That same day, B. Riley filed a Form 8-K with the SEC, which reported, in relevant part:

> On May 10, 2023, ***B. Riley . . . entered into certain agreements pursuant to which B. Riley has, among other things, agreed to provide certain equity funding and other support in connection with the acquisition (the "Acquisition") by Freedom VCM, Inc., a Delaware corporation (the "Parent"), of [Franchise Group].*** Parent has agreed to acquire FRG pursuant to an Agreement and Plan of Merger, dated as of May 10, 2023, by and among the Parent, Freedom VCM Subco, Inc., a Delaware corporation and a wholly-owned subsidiary of the Parent (the "Merger Sub"), and FRG (the "Merger Agreement"), pursuant to which, upon the terms and subject to the conditions set forth therein, at the closing, Merger Sub will merge with and into FRG, with FRG surviving the merger as a wholly owned subsidiary of Parent. The buyer group includes members of the senior management team of FRG, led by Brian Kahn, ***FRG's [CEO], in financial partnership with a consortium that includes B. Riley. B. Riley is not a party to the Merger Agreement. Pursuant to a commitment letter, B. Riley has agreed to fund upon the closing of the merger up to $560 million in equity financing, though expects the actual amount to be funded to be substantially less.***

69. On May 11, 2023, B. Riley issued a press release announcing its entry into an Equity Commitment Letter and Limited Guarantee stating, in relevant part:

> The buyer group includes members of the senior management team of FRG, led by Brian Kahn, FRG's [CEO], in financial partnership with a consortium that includes B. Riley. B. Riley is not a party to the Merger Agreement.
>
> * * *
>
> B. Riley entered into the Equity Commitment Letter and the Limited Guarantee, each as defined below in connection with the [FRG Buyout].
>
> *Equity Commitment Letter*

> B. Riley entered into an Equity Commitment Letter, dated as of May 10, 2023 (the "Equity Commitment Letter"), with Freedom VCM Holdings, LLC ("TopCo") and Parent, pursuant to which ***B. Riley, subject to the terms and conditions of the Equity Commitment Letter, has agreed to contribute to TopCo, at or prior to the closing of the Merger, an amount equal to $560 million in equity financing (the "B. Riley Equity Commitment"). The B. Riley Equity Commitment will then be used by TopCo to fund part of the Acquisition.***
>
> ***FRG is a third party beneficiary of the Equity Commitment Letter***, and FRG is entitled to specifically enforce the Equity Commitment Letter; provided, however, that B. Riley's obligations under the Equity Commitment Letter will terminate in the event that any claim is brought by FRG with respect to the Limited Guarantee, as defined below. Subject to certain conditions set forth in the Equity Commitment Letter, B. Riley has the right to assign all or a portion of such commitments to its affiliates, financing sources or other investors, and ***B. Riley expects the actual amount to be funded by it at Closing to be substantially less than the $560 million.***
>
> *Limited Guarantee*
>
> B. Riley and FRG entered into a Limited Guarantee dated as of May 10, 2023 (the "Limited Guarantee") in favor of FRG, to which ***B. Riley agreed to guarantee to FRG the due and punctual payment, performance and discharge when required by Parent or Merger Sub to FRG of certain liabilities and obligations of Parent or Merger Sub under the Merger Agreement pursuant to and in accordance therewith***, including (i) a termination fee due to FRG in the amount of $55,000,000 if the Merger Agreement is terminated under certain specified circumstances provided for in the Merger Agreement; ***(ii) certain reimbursement obligations of Parent when required to be paid by Parent pursuant to the Merger Agreement; and (iii) liabilities or damages resulting from any actual fraud or Willful and Material Breach (as defined in the Merger Agreement) by Parent or Merger Sub required to be paid by Parent or Merger Sub pursuant to the Merger Agreement; provided, that, except in the case of actual fraud or Willful and Material Breach by Parent or Merger Sub, the aggregate liability of B. Riley under the Limited Guarantee will not exceed $57,000,000.*** B. Riley also waived certain defenses arising out of certain events set forth in the Limited Guarantee.

70. On July 27, 2023, B. Riley filed with the SEC a Form 424B5 Prospectus supplement, which contained the following description of the proposed Franchise Group transaction:

> *Proposed FRG Transaction*

On May 10, 2023, [Franchise Group] announced that it had entered into a definitive merger agreement pursuant to which members of the senior management team of FRG and related entities would acquire the approximately 64% of FRG's common stock not owned by them. ***At the same time, the Company entered into an equity commitment letter with the acquisition vehicle formed by FRG senior management pursuant to which, among other things, the Company agreed to provide certain equity funding and other support in connection with the transaction.*** Specifically, the equity commitment letter provides, subject to its terms and conditions, that ***the Company will contribute an amount equal to up to $560 million in equity financing for the transaction (the Company currently expects to invest approximately $250 million pursuant to the equity commitment, with the remainder to be funded by co-investments)***. FRG has scheduled a special meeting of stockholders for August 17, 2023 to vote on the transaction and related matters. The proposed transaction is anticipated to close in the second half of 2023, subject to satisfaction or waiver of the closing conditions contained in the definitive documentation.

*Credit Facility*

The Company is in discussions with certain of its lenders in respect of a new secured credit facility that, if fully drawn, would increase the Company's aggregate consolidated indebtedness by up to ***an additional $300 million, a portion of the proceeds of which would be used to finance the Company's equity investment in FRG. If entered into, the new secured credit facility is expected to be secured by a first priority lien on, among others, all assets secured by the Company's existing secured credit facility.***

71. On August 9, 2023, B. Riley filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2023 (the "2Q23 10-Q"), which stated, in relevant part:

*Badcock Loan Receivable*

On December 20, 2021, the Company entered into a Master Receivables Purchase Agreement with W.S. Badcock Corporation, a Florida corporation ("WSBC"), ***an indirect wholly owned subsidiary of [Franchise Group]. The Company paid $400,000 in cash to WSBC for the purchase of certain consumer credit receivables of WSBC. On September 23, 2022, the Company's subsidiary, B Riley Receivables II, LLC ("BRRII"), a Delaware limited liability company, entered into a Master Receivables Purchase Agreement ("2022 Badcock Receivable") with WSBC. This purchase of $168,363 consumer credit receivables of WSBC was partially financed by a $148,200 term loan*** discussed in Note 11. ***During the six months ended June 30, 2023, BRRII entered into***

> ***Amendment Nos. 2 and No. 3 to the 2022 Badcock Receivable with WSBC for a total of $145,278 in additional consumer credit receivables.*** The accounting for these transactions resulted in the Company recording a loan receivable from WSBC with the recognition of interest income at an imputed rate based on the cash flows expected to be received from the collection of the consumer receivables that serve as collateral for the loan. The loan receivable was measured at fair value on the condensed consolidated balance sheets.
>
> In connection with these loans, the Company entered into a Servicing Agreement with WSBC pursuant to which WSBC provides to the Company certain customary servicing and account management services in respect of the receivables purchased by the Company under the Receivables Purchase Agreement. In addition, subject to certain terms and conditions, ***FRG has agreed to guarantee the performance by WSBC of its obligations under the Master Receivables Purchase Agreements and the Servicing Agreement.***
>
> * * *
>
> *FRG Commitments and Guarantees*
>
> ***On May 10, 2023, we entered into certain agreements pursuant to which we have, among other things, agreed to provide certain equity funding and other support in connection with the acquisition*** (the "Acquisition") by Freedom VCM, Inc., a Delaware corporation ("Parent"), of [Franchise Group]. Parent has agreed to acquire FRG pursuant to an Agreement and Plan of Merger, dated as of May 10, 2023, by and among Parent, Freedom VCM Subco, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent (the "Merger Sub"), and FRG (the "Merger Agreement"), pursuant to which, upon the terms and subject to the conditions set forth therein, at the closing, Merger Sub will merge with and into FRG, with FRG surviving the merger as a wholly owned subsidiary of Parent. ***The buyer group includes members of the senior management team of FRG, led by FRG's [CEO]. We are not a party to the Merger Agreement.***
>
> * * *
>
> *Equity Commitment Letter*
>
> We entered into an Equity Commitment Letter, dated as of May 10, 2023 (the "Equity Commitment Letter"), with Freedom VCM Holdings, LLC ("TopCo") and Parent, pursuant to which we, subject to the terms and conditions of the Equity Commitment Letter***, have agreed to contribute to TopCo, at or prior to the closing of the Merger, an amount equal to up to $560.0 million in equity financing (the "B. Riley Equity Commitment"). The B. Riley Equity Commitment will then be used by TopCo to fund part of the Acquisition.***

> ***FRG is a third party beneficiary of the Equity Commitment Letter***, and FRG is entitled to specifically enforce the Equity Commitment Letter; provided, however, that our obligations under the Equity Commitment Letter will terminate in the event that any claim is brought by FRG with respect to the Limited Guarantee, as defined below. Subject to certain conditions set forth in the Equity Commitment Letter, we have the right to assign all or a portion of such commitments to its affiliates, financing sources or other investors, and we expect the actual amount to be funded by it at Closing to be less than the $560.0 million.
>
> *Limited Guarantee*
>
> We entered into a Limited Guarantee with FRG dated as of May 10, 2023 (the "Limited Guarantee") in favor of FRG, pursuant to which we agreed to guarantee to FRG the due and punctual payment, performance and discharge when required by Parent or Merger Sub to FRG of certain liabilities and obligations of Parent or Merger Sub under the Merger Agreement pursuant to and in accordance therewith, including (i) a termination fee due to FRG in the amount of $55.0 million if the Merger Agreement is terminated under certain specified circumstances provided for in the Merger Agreement; (ii) certain reimbursement obligations of Parent when required to be paid by Parent pursuant to the Merger Agreement; and (iii) ***liabilities or damages resulting from any actual fraud or Willful and Material Breach (as defined in the Merger Agreement) by Parent or Merger Sub required to be paid by Parent or Merger Sub pursuant to the Merger Agreement;*** provided, that, except in the case of actual fraud or Willful and Material Breach by Parent or Merger Sub, our aggregate liability under the Limited Guarantee will not exceed $57.0 million. We also waived certain defenses arising out of certain events set forth in the Limited Guarantee.

72. On August 25, 2023, B. Riley filed with the SEC the "Credit Agreement, dated August 21, 2023, among B. Riley Financial, Inc., BR Financial Holdings, LLC, each of the lenders from time to time parties thereto, Nomura Corporate Funding Americas, LLC, and Computershare Trust Company, N.A.," as Exhibit 10.1 to a Form 8-K. In the Company's 8-K filing, the Company announced the completion of equity financing in connection with the acquisition of Franchise Group and stated:

> On August 21, 2023, B. Riley . . . completed a previously announced equity financing (the "Equity Investment") in connection with the acquisition (the "Acquisition") of [FranchiseGroup], ***by a buyer group that included members of senior management of FRG, led by Brian Kahn, FRG's [CEO], in a financial partnership with a consortium that includes certain of Brian Kahn's affiliate***

> ***entities***, the Company and certain other investors. The Acquisition was completed pursuant to the terms of that certain Agreement and Plan of Merger, dated as of May 10, 2023 (the "Merger Agreement"), by and among FRG, Freedom VCM, Inc., a Delaware corporation ("Parent") and Freedom VCM Subco, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub"). Pursuant to the Merger Agreement, Merger Sub merged with and into FRG (the "Merger"), with FRG surviving the Merger as a subsidiary of Parent. The Company was not a party to the Merger Agreement. In connection with the Acquisition, a subsidiary of the Company made a new cash Equity Investment of ***$216.5 million in FRG's new parent entity, bringing the Company's entire equity investment in the parent entity to approximately $280 million.***

73. On August 28, 2023, B. Riley issued a press release entitled "B. Riley Leads Financing for Management Buyout of Franchise Group," which stated that the Company had "led the equity financing to facilitate the $2.8 billion management-led acquisition of [Franchise Group] which was completed on August 21, 2023." The press release also disclosed, in relevant part:

> ***B. Riley invested $216.5 million of new capital in the transaction. Other institutional, financial and strategic investors invested approximately $280 million of additional equity capital in the new FRG alongside significant rollover equity contributions from FRG management.*** As a result of the completed transaction, the management-led consortium has acquired all the outstanding and issued common and preferred stock of FRG.

74. The statements issued by the Company as it negotiated the FRG Buyout were materially false and misleading and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) Kahn and his affiliated entities were engaged in illicit business activities; and (ii) the foregoing was reasonably likely to subject B. Riley to regulatory scrutiny.

**<u>The Truth Emerges</u>**

75. On November 2, 2023, the U.S. Attorney's Office for the District of New Jersey announced that Hughes, the former Co-Founder and executive of the investment fund, Prophecy, pleaded guilty to conspiring to defraud investors out of $294 million in funds. The DOJ Charging Papers stated, in relevant part:

> From in or around January 2015 to in or around March 2020, defendant John Hughes ("HUGHES") conspired with Co-conspirator-1 and Co-conspirator-2 to defraud dozens of investors ("Victims") who had invested approximately $360 million in investment funds managed by Prophecy Asset Management LP ("Prophecy"), through lies, deception, misleading statements, and material omissions relating to, among other things: (a) the purported low-risk, transparent, and diversified nature of Prophecy's funds; (b) the manner and purpose in which HUGHES, Coconspirator-1, and Co-conspirator-2 used money from those funds; and (c) the financial position of Prophecy's funds leading up to its collapse in or around March 2020.

76. The DOJ charging papers described the fraud perpetrated in conjunction with "Co-conspirator-2" who was an "investment manager (called a 'sub-advisor') for Prophecy." Specifically, it stated that "[s]ince in or around 2019, Co-conspirator-2 was also the CEO and President of a multi-billion dollar company that owned and managed large and diversified retail franchises."

77. Hughes admitted he worked with two co-conspirators—a cofounder of Prophecy and the CEO of a multibillion-dollar retail franchise company. Bloomberg reported that the latter was Kahn.[7]

78. Hughes also admitted he helped raise hundreds of millions of dollars by falsely marketing Prophecy as following a low-risk and transparent investment strategy in which investors money were spread among many so-called sub-advisers with successful track records. These sub-advisers were also supposed to provide cash collateral equivalent to 10% of the Prophecy funds they were accessing.

79. In reality, however, 86% of Prophecy's funds were allocated to only six trading entities controlled by Kahn, who was largely exempted from the collateral requirements. Those entities lost $294 million by March 2020, but Hughes, Kahn, and another co-conspirator concealed the losses from investors and their auditor through bogus transactions and forged documents.

80. Also on November 2, 2023, the SEC filed a civil action against Hughes, captioned *Securities and Exchange Commission v. Hughes*, No. 3:23-cv-21816 (D.N.J.), which alleged that

Hughes—together with a co-conspirator referred to only as "Individual 2"—committed fraud in connection with his dealings with Prophecy.

81. Later that day, *Bloomberg* reported that "a person familiar with the matter" had identified Kahn as one of the two co-conspirators referenced in the SEC complaint.

82. With respect to the co-conspirator referred to as "Individual 2," the SEC complaint stated, in relevant part, as follows:

> Hughes, Individuals 1 and 2, and PAM [*i.e.*, Prophecy] deceived Prophecy's administrator and auditor by entering into sham transactions to provide Individual 2 with cash to cover his trading losses and falsifying documentation designed to create the appearance that Individual 2's trading losses remained secured by non-cash collateral[.]
>
> * * *
>
> To purportedly secure the receivable with collateral, Prophecy and Individual 2 entered into at least six agreements consisting of, among other things, personal guaranties, promissory notes, and other pledged "assets," which did not exist or had questionable value.
>
> * * *
>
> Hughes and Individual 2 fabricated certain documents concerning a purported agreement between Prophecy and [Buddy's], a company controlled by Individual 2. Specifically, Individual 2 created an agreement titled, "Buddy's Newco LLC Series A Preferred Stock Agreement" ("Buddy's Preferred Stock Agreement"). On April 10, 2019, Individual 2 emailed Hughes a draft of the Buddy's Preferred Stock Agreement that purported to show Prophecy's ownership of $125 million worth of preferred shares of Buddy's stock, backdated to January 1, 2018. By June 3, 2019, Individual 2 delivered to Hughes two Buddy's Convertible Stock Certificates ("Buddy's Certificates") ***backdated*** to January 3, 2018***. One of the certificates was for 75 shares with a purported valuation of $75 million. The second certificate was for 150 shares with a purported valuation of $150 million.***
>
> Subsequently, Hughes provided Prophecy's auditor with the Buddy's Preferred Stock Agreement and the Buddy's Certificate purportedly valued at $75 million. In response to a series of questions from Prophecy's auditor to Individual 2, which he forwarded to Hughes, Individual 2 falsely confirmed that Individual 2 had authority to issue the preferred stock to Prophecy and that the preferred stock was collateral used to secure Individual 2's 2018 trading losses, was issued and outstanding as of December 31, 2018, and was issued in Prophecy's name. In

> reality, ***Buddy's Newco LLC Series A Preferred Shares were never issued to Prophecy or anybody else because the shares never existed. The entire agreement and transaction was a sham created by Hughes and Individual 2.***
>
> * * *
>
> Although Individual 2 had a cash collateral deficit in excess of $50 million during the fall of 2018, Prophecy provided a $36 million unsecured loan to Vintage Capital Management LLC ("Vintage"), an asset management company controlled by Individual 2.
>
> Hughes and Individual 1 understood that Individual 2 was going to use the loan proceeds to provide rescue financing to a company in which Vintage was heavily invested. Hughes and Individual 2 again entered into a series of complex sham transactions to conceal the failed loan. This time, Prophecy "invested" $36 million into two other entities controlled by Individual 2, which then routed the money to Vintage so it could repay the loan owed to Prophecy.

83. On November 3, 2023, after the market closed, the *Friendly Bear* posted an excerpt of the *Bloomberg* report on X (formerly known as Twitter), and questioned whether Kahn disclosed the Prophecy fraud to B. Riley, and whether B. Riley disclosed it to Nomura when the Company upsized its credit facility with Nomura to buy Franchise Group.

84. The *Friendly Bear* also commented on the DOJ Charging Papers, stating:

> Brian Kahn is co-conspirator 2 here. This charging document clearly implicates in him Hughes' crime. There is a high chance of indictment here. $FRG is extremely overlevered, a 'bet on Kahn', and could lose access to critical funding upon indictment.

85. On this news, B. Riley's stock price fell $9.02, or 22%, to close at $32.54 per share on the next trading day, November 6, 2023, on unusually heaving trading volume. The price of the Company's Senior Notes declined over 9% during that same period.

86. Nevertheless, in the following days, Defendant Riley offered unmitigated support for Kahn, stating:

> I know that today, a statement came out from Brian [Kahn] denying any involvement and what happened with Prophecy, and that's good enough for me.

* * *

> [O]ur confidence in these businesses [Franchise Group] has not waned at all…. As CEO, Brian Kahn was the architect to help put these businesses together to form FRG as it is known today. I've known Brian for many years and have and no direct experience with what has been alleged.

87. On November 9, 2023, after the market closed, B. Riley filed its quarterly report on Form 10-Q for the period ended September 30, 2023 (the "3Q23 10-Q"), revealing significant details concerning the FRG Buyout and the years-long series of complex financial transactions between B. Riley, Kahn, and their various companies, culminating in the August 21, 2023 transaction. Specifically, the 3Q23 10-Q described the transactions as follows:

(a) B. Riley, via wholly owned subsidiary BR Financial Holdings, LLC, entered into a credit agreement with Nomura Corporate Funding Americas, LLC.

(b) B. Riley used those funds to fund an equity investment in Freedom VCM Holdings, LLC, an indirect parent entity for Franchise Group, in exchange for $281.1 million. In return, B. Riley assumed a 31% voting interest in Freedom VCM Holdings, LLC.

(c) On the same day, B. Riley, Franchise Group, and their subsidiaries entered into a series of related party transactions. One of B. Riley's subsidiaries, B. Riley Receivables II, LLC, had previously entered into a series of loan receivable transactions between 2021 and 2022 with Badcock, an indirect subsidiary of Franchise Group, amounting to $33.60 million. In connection with the August 21, 2023 deal, B. Riley also sold its entire equity interest in B Riley Receivables II, LLC to Freedom VCM Receivables, Inc. for $58.9 million. In exchange Freedom VCM Receivables, Inc. then assumed a significant obligation and entered into a note receivable with B. Riley Receivables II, LLC for $58.87 million and one of Franchise Group's subsidiaries became a related-party loan receivable with a fair value of $33.60 million.

88. Analyzing these disclosures, the *Friendly Bear* posted the following on X that day:

> In original $FRG deal, $RILY estimated the equity account at around 560MM in total (with 1.035B total market cap acquired at 475mm of that funded by Irradiant). ***B Riley ended up funding 281MM of what was around a 560MM equity check. That's over 50% ownership. Yet they claim to have only 31% voting rights. It looks like B Riley engaged in some funny business to avoid consolidation and placed control of FRG in the hands of the star of "Prophecy" – Brian Kahn.***

89. On this news, B. Riley's stock price fell $4.47, or 15%, to close at $25.60 per share on November 10, 2023, on unusually heavy trading volume. The Company's stock price continued to fall, closing at $22.01 per share on November 13, 2023.

**The Truth Continues to Emerge**

90. As new details continued to emerge regarding Kahn's involvement in the Prophecy fraud, the devastating impact of B. Riley's relationship with Kahn became clear.

91. On January 21, 2024, *Bloomberg* reported that the SEC had "carried out interviews in recent months about B. Riley and its relationship with Brian Kahn[.]"[9] On this news, the Company's stock price fell by $0.50, or 2.5%, to close at $19.68 per share on January 22, 2024.

92. On February 12, 2024, the *Wall Street Journal* published two articles revealing a "longer and closer relationship [between B. Riley and Kahn] than previously known." Citing a July 2023 slide presentation by Nomura, the *Wall Street Journal* identified a series of undisclosed loans by B. Riley to Kahn over the years, the earliest listed of which was a $37 million loan in July 2019. According to the *Wall Street Journal*, which reviewed Uniform Commercial Code financing statements filed with state agencies in Nevada, Delaware, and Florida, B. Riley made ten different loans to Kahn and entities he controlled from 2018 through 2023. By mid-2023, the principal balance of these loans had ballooned to $154 million. In addition, the *Wall Street Journal* articles revealed that B. Riley "lent $201 million to Kahn's investment firm, which pledged its FRG shares as collateral."

93. Following the publication of these articles, the Company's stock price decreased from a closing price of $20.84 on February 12, 2024, to a closing price of $18.73 on February 13,

2024, a decline of more than 10%. By the close of trading on February 21, 2024, B. Riley's stock price had declined to only $15.20 per share.

94. Although Kahn has denied his involvement in the Prophecy fraud, he agreed to pay more than $200 million, including cash and shares in Franchise Group, to compensate Prophecy's investors. As of February 13, 2024, however, Kahn had reportedly failed to pay $1.5 million in cash or turn over $5 million in shares due by a January 31st deadline. Kahn had also reportedly failed to hand over shares he had pledged in a separate agreement.

95. Announcing the results of the Company's internal review of its relationship with Kahn on February 22, 2024, B. Riley affirmed its confidence in the long-term investment thesis for Franchise Group and the Board confirmed "its confidence in the integrity of the Company's reporting with respect to" Kahn and his related entities.

96. On February 29, 2024, the Company announced preliminary financial results for the fourth quarter and full year ending December 31, 2023, disclosing net losses of $86 million for the year driven primarily by a non-cash impairment charge of $71 million. The Company also disclosed that it would be filing with the SEC a notice of the late filing of its Annual Report on Form 10-K for the 2023 fiscal year.

97. When the Company finally filed its 2023 Form 10-K on April 24, 2024, it disclosed a net loss of $108 million for the year, larger than the $86 million preliminary loss disclosed in February. The 2023 Form 10-K also disclosed that B. Riley's auditors had identified material weaknesses in the Company's internal control over financial reporting.

98. On August 12, 2024, B. Riley released preliminary results for the second quarter of 2024, revealing a net loss for the quarter of between $435 million and $475 million. The Company also disclosed that it expected a non-cash markdown of between $330 million and $370 million due to its investment in Franchise Group's parent entity, Freedom VCM.

99. The Company further disclosed that it would be late in filing its Form 10-Q with the SEC—the third time in 2024 that B. Riley had missed a regulatory filing deadline—"due to delays experienced in finalizing valuations of certain of the Company's loans and investments for

the quarter." The Company also announced that it would be suspending its common dividend to "prioritize deleveraging."

100. According to Defendant Riley, the Company's "second quarter results were negatively impacted by non-cash losses, the overwhelming majority of which relate to performance of our investment in Franchise Group Inc. and our Vintage Capital loan receivable, which is primarily collateralized by equity interests in [Franchise Group]."

101. During a conference call that same day, Defendant Riley noted that he and B. Riley had received subpoenas from the SEC in July that "primarily relate to the company's dealings with Brian Kahn." According to Defendant Riley, the Company had already completed an internal review of these matters, which concluded that the Company "had no knowledge of any alleged misconduct concerning Brian Kahn or his affiliates."

102. News reports also indicated that the SEC's inquiry included a review of possible insider trading and the movement between companies of receivables from cash-strapped retail customers whose repayment might be doubtful. The SEC's civil probe is proceeding alongside a federal criminal inquiry in New Jersey.

103. Despite Defendant Riley's attempts to assuage investors' concerns, the Company's stock price declined dramatically in response to these disclosures, falling from a closing price of $16.95 per share on August 9, 2024 to close at $8.02 per share on August 12, 2024. By August 15, 2024, the Company's shares were trading at only $5.04 per share and the Company's market cap was only $153 million, compared to $652 million at the end of March.

104. On August 16, 2024, Defendant Riley sent the Board an unsolicited preliminary, non-binding letter of proposal to take the Company private at a proposed purchase price of $7 per share, valuing the Company at $212 million. While the Company's announcement of this offer gave B. Riley shares a slight boost, the Company's stock still lost nearly 70% of its value, or about $360 million, that week alone, plunging to ten-year lows after the bank warned of a second quarter loss and delayed its financial reports.

105. On September 9, 2024, B. Riley outlined preliminary plans to strengthen its

balance sheet, confirming that it was in talks to sell a majority stake in Great American Group and that it had entered into a non-binding commitment for debt financing of its B. Riley and bebe brands businesses. If completed, B. Riley would receive approximately $410 million of gross cash proceeds from the two transactions, which the Company intended to use to reduce the amount of outstanding debt under its Nomura Senior Secured Credit Agreement to approximately $125 million by the end of 2024.

106. On September 23, 2024, the Company filed a Form 8-K with the SEC, which disclosed that Nomura had terminated B. Riley's revolving credit line and increased the interest rate on the remaining loan.

107. Ultimately, B. Riley partnered with Oaktree Capital Management, L.P. ("Oaktree") to launch Great American Group as an independent business in November 2024, with the Company receiving proceeds of approximately $203 million in cash.

108. On November 3, 2024, Franchise Group announced that it had commenced voluntary Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. Franchise Group also disclosed that it would be winding down American Freight, which it acquired in early 2020—with the assistance of B. Riley.

109. The Chapter 11 bankruptcy filing by Franchise Group and its subsidiary Freedom VCM Holdings, LLC,, Inc. has had several significant impacts on the Company. The Company will have to record an additional non-cash impairment of $118.0 million related to its investment in Freedom VCM Holdings and the Vintage Loan Receivable. After these impairments, B. Riley ascribed no value to its Freedom VCM investment, essentially writing it off.

110. The value of the loan receivable from Vintage Capital, which was collateralized by equity interests in Franchise Group was significantly reduced, with further decreases noted by December 20, 2024.

111. As of the end of 2024, B. Riley had yet to file quarterly reports for both the second and third quarters of the year and had received a delinquency notification letter from Nasdaq. As of January 13, 2025, the Company's stock was trading around $4 per share.

112. Finally, on January 14, 2025, the Company filed its long delayed Form 10-Q for the second quarter ended June 30, 2024. The 10-Q The Form 10-Q summarized "Recent Developments" as follows:

(a) On or about November 15, 2024, the Company, through its subsidiary BR Financial Holdings, LLC, finalized an equity purchase agreement with investors linked to Oaktree Capital Management. This deal involved restructuring the ownership of Great American Holdings, LLC where the investors received Class A Preferred and Common Units, and BR Financial retained a portion of Class B Preferred and Common Units.

(b) On October 31, 2024**,** the Company agreed to sell part of its traditional Wealth Management business to Stifel Financial Corp. for $27.0 million to $35.0 million in cash, based on the number of advisors transferring. This sale involves up to 15% of its wealth management advisors and up to $4.5 billion in assets under management.

(c) On October 25, 2024, the Company transferred its interest in several brand management entities to BR Funding 2024-1, LLC, which then issued secured financing notes and preferred stock to HBN 101, LLC, generating approximately $189.3 million. Additionally, bebe stores, inc. sold its brand interests for $46.6 million, with part of the proceeds used to pay off existing debt.

(d) The 10-Q further reported that the Company amended its credit agreements with Nomura on September 17, 2024, by reducing the outstanding principal of the term loan to $388.1 million after a $85.1 million payment and terminated a $100 million revolving credit facility. The Company also extended the maturity date under certain conditions.

(e) The Company further detailed that the SEC served it with a subpoena on July 3 and November 22, 2024 regarding business dealings, transactions in securities, and compliance policies. The November 22, 2024, SEC subpoena was directed to the Company and Riley and requested the production of certain additional documents and information relating to Franchise Group, Inc. (including its holding company, Freedom VCM Holdings, LLC) as well as Riley's personal loan and his pledge of shares of the Company's common stock as collateral for such loan.

(f) Finally, the Company disclosed it faced significant non-cash impairments due to the financial troubles and subsequent Chapter 11 filings by Conn's and FRG, leading to impairments in investments and loans related to these entities.

113. In addition, the Company and certain of the Individual Defendants have been sued in multiple class actions on behalf of both B. Riley stockholders and noteholders, as well as FRG stockholders (the "Class Actions"). The Class Actions alleged that B. Riley aided and abetting breaches of FRG fiduciaries' duties and that B. Riley and other defendants violated various federal securities laws.

**PROXY STATEMENTS**

114. On April 19, 2022, B. Riley filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement was solicited by Defendants Riley, Kelleher, Antin, Brandt, D'Agostino, LaBran, Paulson, Sheldon, and Walters (the "Proxy Defendants") and called for shareholder to vote to approve, *inter alia*: (1) the reelection of the Proxy Defendants to the Board; and (2) the compensation of the Company's executive officers.

115. Regarding B. Riley's Code of Conduct, the 2022 Proxy Statement provided:

> Our Board has adopted a Code of Business Conduct and Ethics that applies to all our directors, officers, and employees. The Code of Business Conduct and Ethics is available for review on our website at *http://ir.brileyfin.com/governance*, and is also available in print, without charge, to any stockholder who requests a copy by writing to us at B. Riley Financial, Inc., 11100 Santa Monica Boulevard, Suite 800, Los Angeles, California 90025, Attention: Investor Relations. Each of our directors, employees, and officers, including our Co-Chief Executive Officers, Chief Financial Officer and Chief Accounting Officer, and all of our other principal executive officers, are required to comply with the Code of Business Conduct and Ethics. There have not been any waivers of the Code of Business Conduct and Ethics relating to any of our executive officers or directors in the past year.

116. Regarding the Board's role in risk management, the 2022 Proxy Statement provided the following, in relevant part:

> The Board as a whole has responsibility for risk oversight, with reviews of certain areas being conducted by the relevant Board committees. These committees then provide reports to the full Board. The oversight responsibility of the Board and its committees is enabled by management reporting processes that are designed to provide visibility to the Board about the identification, assessment, and management of critical risks and management's risk mitigation strategies. These areas of focus include strategic, operational, cybersecurity, financial and reporting, succession and compensation, and other risks. The Board and its committees

> oversee risks associated with their respective areas of responsibility, as summarized below. Each committee meets in executive session with key management personnel and representatives of outside advisors as required.

117. The foregoing statements contained in the 2022 Proxy Statement were materially false and misleading because, contrary to the assertions contained therein, the Proxy Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

118. Moreover, the 2022 Proxy Statement was false and misleading as it failed to disclose that: (i) Kahn and his affiliated entities were engaged in illicit business activities; and (ii) those activities were reasonably likely to subject B. Riley to regulatory scrutiny.

119. On April 18, 2023, B. Riley filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement was solicited by the Proxy Defendants and called for shareholder to vote to approve, *inter alia*: (1) the reelection of the Proxy Defendants to the Board; and (2) the compensation of the Company's executive officers.

120. Regarding B. Riley's Code of Conduct, the 2023 Proxy Statement provided:

> Our Board has adopted a Code of Business Conduct and Ethics that applies to all our directors, officers, and employees. The Code of Business Conduct and Ethics is available for review on our website at *http://ir.brileyfin.com/governance*, and is also available in print, without charge, to any stockholder who requests a copy by writing to us at B. Riley Financial, Inc., 11100 Santa Monica Boulevard, Suite 800, Los Angeles, California 90025, Attention: Investor Relations. Each of our directors, employees, and officers, including our Co-Chief Executive Officers, Chief Financial Officer, and Chief Accounting Officer, are required to comply with the Code of Business Conduct and Ethics. There have not been any waivers of the Code of Business Conduct and Ethics relating to any of our executive officers or directors in the past year.

121. Regarding the Board's role in risk management, the 2023 Proxy Statement provided the following, in relevant part:

> The Board as a whole has responsibility for risk oversight, with reviews of certain areas being conducted by the relevant Board committees. These committees then provide reports to the full Board. The oversight responsibility of the Board and its committees is enabled by management reporting processes that are designed to provide visibility to the Board about the identification, assessment, and

> management of critical risks and management's risk mitigation strategies. These areas of focus include strategic, operational, cybersecurity, financial and reporting, succession and compensation, and other risks. The Board and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each committee meets in executive session with key management personnel and representatives of outside advisors as required.

122. The foregoing statements contained in the 2023 Proxy Statement were materially false and misleading because, contrary to the assertions contained therein, the Proxy Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

123. Moreover, the 2023 Proxy Statement was false and misleading as it failed to disclose that: (i) Kahn and his affiliated entities were engaged in illicit business activities; and (ii) those activities were reasonably likely to subject B. Riley to regulatory scrutiny.

124. On May 10, 2024, B. Riley filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement was solicited by the Proxy Defendants and called for shareholder to vote to approve, *inter alia*: (1) the reelection of the Proxy Defendants to the Board; and (2) the compensation of the Company's executive officers.

125. Regarding B. Riley's Code of Conduct, the 2024 Proxy Statement provided:

> Our Board has adopted a Code of Business Conduct and Ethics that applies to all our directors, officers, and employees. The Code of Business Conduct and Ethics is available for review on our website at *http://ir.brileyfin.com/governance*, and is also available in print, without charge, to any stockholder who requests a copy by writing to us at B. Riley Financial, Inc., 11100 Santa Monica Boulevard, Suite 800, Los Angeles, California 90025, Attention: Investor Relations. Each of our directors, employees, and officers, including our Co-Chief Executive Officers, Chief Financial Officer, and Chief Accounting Officer, are required to comply with the Code of Business Conduct and Ethics. There have not been any waivers of the Code of Business Conduct and Ethics relating to any of our executive officers or directors in the past year.

126. Regarding the Board's role in risk management, the 2024 Proxy Statement provided the following, in relevant part:

> The Board as a whole has responsibility for risk oversight, with reviews of certain areas being conducted by the relevant Board committees. These committees then

> provide reports to the full Board. The oversight responsibility of the Board and its committees is enabled by management reporting processes that are designed to provide visibility to the Board about the identification, assessment, and management of critical risks and management's risk mitigation strategies. These areas of focus include strategic, operational, cybersecurity, financial and reporting, succession and compensation, and other risks. The Board and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each committee meets in executive session with key management personnel and representatives of outside advisors as required.

127. The foregoing statements contained in the 2024 Proxy Statement were materially false and misleading because, contrary to the assertions contained therein, the Proxy Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

128. Moreover, the 2024 Proxy Statement was false and misleading as it failed to disclose that: (i) Kahn and his affiliated entities were engaged in illicit business activities; and (ii) those activities were reasonably likely to subject B. Riley to regulatory scrutiny.

129. On October 22, 2025, B. Riley filed the 2025 Proxy Statement. The 2025 Proxy Statement was solicited by the Proxy Defendants and called for shareholder to vote to approve, *inter alia*: (1) the reelection of the Proxy Defendants to the Board; and (2) the compensation of the Company's executive officers.

130. Regarding B. Riley's Code of Conduct, the 2025 Proxy Statement provided:

> Our Board has adopted a Code of Business Conduct and Ethics that applies to all our directors, officers, and employees. The Code of Business Conduct and Ethics is available for review on our website at *http://ir.brileyfin.com/governance*, and is also available in print, without charge, to any stockholder who requests a copy by writing to us at B. Riley Financial, Inc., 11100 Santa Monica Boulevard, Suite 800, Los Angeles, California 90025, Attention: Investor Relations. Each of our directors, employees, and officers, including our Co-Chief Executive Officers, Chief Financial Officer, and Chief Accounting Officer, are required to comply with the Code of Business Conduct and Ethics. There have not been any waivers of the Code of Business Conduct and Ethics relating to any of our executive officers or directors in the past year.

131. Regarding the Board's role in risk management, the 2025 Proxy Statement provided the following, in relevant part:

> The Board as a whole has responsibility for risk oversight, with reviews of certain areas being conducted by the relevant Board committees. These committees then provide reports to the full Board. The oversight responsibility of the Board and its committees is enabled by management reporting processes that are designed to provide visibility to the Board about the identification, assessment, and management of critical risks and management's risk mitigation strategies. These areas of focus include strategic, operational, cybersecurity, financial and reporting, succession and compensation, and other risks. The Board and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each committee meets in executive session with key management personnel and representatives of outside advisors as required.

132. The foregoing statements contained in the 2025 Proxy Statement were materially false and misleading because, contrary to the assertions contained therein, the Proxy Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

133. Moreover, the 2025 Proxy Statement was false and misleading as it failed to disclose that: (i) Kahn and his affiliated entities were engaged in illicit business activities; and (ii) those activities were reasonably likely to subject B. Riley to regulatory scrutiny.

**<u>THE SECURITIES CLASS ACTION</u>**

134. On December 12, 2025, Judge Sherilyn Peace Garnett granted in part and denied in part a motion to dismiss the Securities Class Action. In doing so, Judge Garnett found that the Plaintiffs "adequately alleged that the Company's failure to disclose the VCM Loan rendered its statements as to the FRG Buyout misleading." In finding that Plaintiffs had sufficiently alleged that Defendant Riley acted with scienter, Judge Garnett wrote:

> Given Riley's abrupt resignation from the FRG board, his personal involvement in the FRG Buyout, the size of the FRG Buyout, and Kahn's importance to the Company's business, the Court infers for purposes of this Motion that Riley was at least aware of public allegations Kahn had engaged in fraud. With the other allegations supporting scienter, the inference that Riley acted with deliberate recklessness is at least as compelling as any nonculpable explanation for the Company's failure to disclose the VCM Loan.

**<u>DAMAGES TO B. RILEY</u>**

135. As a direct and proximate result of the Individual Defendants' misconduct, B. Riley has expended and will continue to expend many millions of dollars.

136. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to B. Riley. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

137. As a direct and proximate result of the Individual Defendants' conduct, B. Riley has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties. The credibility and motives of management are now in serious doubt.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

138. Plaintiff brings this action derivatively in the right of and for the benefit of B. Riley to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, unjust enrichment, waste of corporate assets, and other wrongful conduct as alleged herein.

139. B. Riley is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

140. Plaintiff is an owner of B. Riley stock and has been a continuous shareholder of Company stock at all relevant times.

141. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

142. At the time this suit was filed, the Board consisted of Defendants Antin, Brandt, D'Agostino, Kelleher, LaBran, Paulson, Riley, and Walters (the "Director Defendants").

143. Plaintiff is required to show that a majority of the current Director Defendants cannot exercise independent objective judgment about whether to bring this action.

144. Plaintiff did not make a demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

145. Demand is excused as to Defendant Riley. Defendant Riley has served as the Company's Chairman and Co-CEO since June 2014 and June 2018, respectively, and as a director since 2009. As detailed herein, Defendant Riley derives substantial income from his role at B. Riley. As Co-CEO, Defendant Riley fails the Nasdaq's bright-line independence test and cannot, therefore, be considered independent. In addition, Defendant Riley conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Riley.

146. Demand is excused as to Defendant Kelleher. Defendant Kelleher has served as the Company's Co-CEO since July 2018, and as a director since October 2015. As detailed herein, Defendant Kelleher derives substantial income from his role at B. Riley. As Co-CEO, Defendant Kelleher fails the Nasdaq's bright-line independence test and cannot, therefore, be considered independent. In addition, Defendant Kelleher conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Kelleher.

147. Demand is excused as to Defendant Antin. Defendant Antin has served as a Company director since June 2017. As detailed herein, Defendant Antin derives significant compensation from his role at B. Riley. In addition, Defendant Antin conducted little, if any,

oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Antin.

148. Demand is excused as to Defendant Brandt. Defendant Brandt has served as a Company director since December 2021. As detailed herein, Defendant Brandt derives significant compensation from her role at B. Riley. In addition, Defendant Brandt conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded her duties to monitor internal controls, and failed to protect corporate assets. As she breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Brandt.

149. Demand is excused as to Defendant D'Agostino. Defendant D'Agostino has served as a Company director since October 2015. As detailed herein, Defendant D'Agostino derives significant compensation from his role at B. Riley. In addition, Defendant D'Agostino conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant D'Agostino.

150. Demand is excused as to Defendant LaBran. Defendant LaBran has served as a Company director since August 2021. As detailed herein, Defendant LaBran derives significant compensation from her role at B. Riley. In addition, Defendant LaBran conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded her duties to monitor internal controls, and failed to protect corporate assets. As she breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant LaBran.

151. Demand is excused as to Defendant Paulson. Defendant Paulson has served as a Company director since June 2020. As detailed herein, Defendant Paulson derives significant

compensation from his role at B. Riley. In addition, Defendant Paulson conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Paulson.

152. Demand is excused as to Defendant Walters. Defendant Walters has served as a Company director since July 2019. As detailed herein, Defendant Walters derives significant compensation from her role at B. Riley. In addition, Defendant Walters conducted little, if any, oversight of the scheme to cause B. Riley to make false and misleading statements, disregarded her duties to monitor internal controls, and failed to protect corporate assets. As she breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Walters.

153. Further, Defendants D'Agostino, LaBran, and Paulson have been members of the Audit Committee at relevant times. In these roles, they are responsible for the integrity of B. Riley's financial statements and compliance with applicable laws and regulations. In their capacities as Audit Committee members, Defendants D'Agostino, LaBran, and Paulson reviewed and approved the materially misleading statements and, in contravention of the duties outlined in the Audit Committee Charter, allowed false and misleading statements to be disseminated in B. Riley's SEC filings and other public statements. As such, Defendants D'Agostino, LaBran, and Paulson enabled the Individual Defendants' misconduct, violations of law, and failure to ensure adequate Board oversight over internal control of financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, Defendants D'Agostino, LaBran, and Paulson breached their fiduciary duties and are not disinterested, and demand is further excused as to them.

154. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

155. Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

156. As being Board members, the Director Defendants received, and continue to receive, substantial compensation and benefits. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

157. The Director Defendants' conduct described herein and summarized above could not have been the product of reasonable business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested, and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

158. Publicly traded companies, such as B. Riley, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

159. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, therefore, excused.

**CLAIM I**

***Against the Proxy Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)***

160. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161. The Proxy Defendants solicited the 2022, 2023, 2024, and 2025 Proxy Statements (the "Proxies") containing materially false and misleading statements and/or omissions.

162. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

163. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

164. The Proxies were materially false and misleading because, contrary to the assertions contained therein, the Proxy Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

165. The Proxies failed to disclose that: (i) Kahn and his affiliated entities were engaged in illicit business activities; and (ii) those activities were reasonably likely to subject B. Riley to

regulatory scrutiny.

166. In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

167. The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the Proxies.

168. Plaintiff on behalf of B. Riley has no adequate remedy at law.

**CLAIM II**

***Against the Individual Defendants for Breach of Fiduciary Duties***

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of B. Riley's business and affairs, particularly with respect to issues as fundamental as public disclosures.

171. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172. In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall business, operations, and prospects.

173. In breach of their fiduciary duties owed to B. Riley, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

174. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of B. Riley.

175. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

176. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

177. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, B. Riley has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179. Plaintiff, on behalf of B. Riley, has no adequate remedy at law.

## CLAIM III

***Against the Individual Defendants for Unjust Enrichment***

180. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

181. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, B. Riley.

182. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from B. Riley that was tied

to the performance or artificially inflated valuation of B. Riley, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

183. Plaintiff, as a shareholder and a representative of B. Riley, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

184. Plaintiff, on behalf of B. Riley, has no adequate remedy at law.

## CLAIM IV

***Against the Individual Defendants for Waste of Corporate Assets***

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

187. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused B. Riley to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

188. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

189. Plaintiff, on behalf of B. Riley, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of B. Riley and that Plaintiff is a proper and adequate representative of the Company;

B. Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to B. Riley;

C. Against all of the Defendants and in favor of B. Riley for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

D. Directing B. Riley to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect B. Riley and its shareholders from a continuation or repetition of the damaging events described herein;

E. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F. Awarding B. Riley restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants, including profits obtained by insider sales;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 2, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Joel Friedman am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

12/16/2025

DocuSigned by:

Joel Friedman

E24DB3EBC02F4DD...

Joel Friedman